Good morning, ladies and gentlemen. The first case on the docket is Shott v. Rush University Medical Center. Ms. Shott. Good morning, Your Honors, and may it please the Court, I'm Susan Shott, the Plaintiff's Appellant. Thank you very much for letting me speak here today. I greatly appreciate it. I hope I can answer any questions that you may have about the case. In this case, the District Court erroneously granted Rush University Medical Center's motion for summary judgment, thereby improperly dismissing all of Dr. Shott's Section 1981, Title VII, and 88 claims. The District Court did so by means of procedural irregularities that were extremely prejudicial to Dr. Shott, by refusing to take into account important evidence, and by improperly weighing the evidence and resolving factual disputes in Rush's favor. Only a few of these errors can be discussed here. Now, there are discrimination cases that are subtle, but this is not one of them. Rush is paying Dr. Shott's closest salary comparator more than double what Rush pays Dr. Shott for the same worth. And Rush has a longstanding culture of racism, which includes anti-Semitism. This Court has held that use of the N-word is, quote, inherently racially hostile. But Rush disagrees. Does that have anything to do with your case? Yes, it does, because when you're in an environment where the N-word is considered acceptable. This was a hypothetical in your deposition of one of the doctors, correct? It was a – actually, no, this wasn't a hypothetical. This was a direct question to Dr. Levin, who is a top – one of Rush's top white administrators. This was in 2013. He was quite comfortable testifying on videotape that, in his view, it is not necessarily offensive for white people to use the N-word. Now, racism and anti-Semitism tend to clump together. And if you're in an institution where it is considered acceptable for whites to use the N-word, I think pretty much anything goes. And it makes other allegations of discrimination, including anti-Semitism, much more credible. And there's also much more direct evidence of anti-Semitism as well. But that is a remarkable viewpoint. I should note that Rush has not, in any of its pleadings, repudiated that statement and said, no, we disagree with Dr. Levin. There's nothing in the record that says Rush says we disagree. So it appears to be an administration position. Now, what you're referring to as a hypothetical is less of a hypothetical, as we'll see. It parallels very closely something that actually happened. And Dr. Levin testified, again on videotape, that it would not bother him one bit if a white Rush administrator responded to a remark at a Rush meeting about stealing money by telling her African-American husband, since you're black, you're the one who should steal it. Now, the district court glossed over Dr. Levin's testimony. It's not clear whether the district court agreed with it. It's not clear if the district court did. And that's disturbing. But to the present day, Rush continues to defend adamantly anti-Jewish remarks that were made in the Rush workplace by high-ranking Rush administrators in the presence of subordinates. There are just a few examples that I can think of. Dr. Schott? Yes. I got the impression from your brief that you're arguing that Rush continues to exhibit anti-Semitism by having defended your first lawsuit accusing them of anti-Jewish discrimination successfully. Is that right? No. That's not what I'm arguing. What I'm arguing is that Rush to the present day continues to claim that grossly anti-Semitic remarks are, in fact, according to Rush, not anti-Semitic. In what forum do they make those claims? That is in the response to the amended complaint, to all of the amended complaints. So by defending itself against their accusations? Well, see, there are other ways Rush could defend itself, okay? It could say these remarks were made a long time ago under a different administration, and, yes, they are anti-Semitic, but we, you know, we think they're anti- we disagree with what the previous administration did. We don't feel that way anymore. But to say that a statement, and this is where the hypothetical becomes actual, when a non-Jewish high-ranking Rush administrator at a Rush meeting says to her Jewish husband, when somebody jokes about begging for grant money, says, since you're Jewish, you're the one who should beg for it, and Rush says, oh, that's not an anti-Semitic remark. As I say, there were other ways Rush could have defended things. They could have said, yeah, those remarks were made, and the CEO of Rush finds them intolerable. There were a lot of things they could have done, and they chose instead to defend these remarks. There are remarks that have as their punchline, there's a joke about a Jew and a Scotsman that go to a restaurant, and everybody's betting about going to get stuck with a check, and the betting goes the Jewish person's going to get stuck with it because the Scotsman is going to be even more tight with money than the Jewish man, and when the check is brought to the table, everybody's astounded because the Scotsman says, give it to me, I'll take it, I'll pay it, and everybody's amazed until the next morning when the headline in the newspaper says, Jewish ventriloquist murdered. Rush considers that not anti-Semitic when told by a high-ranking Rush administrator in the Rush workplace. Another one, and then I'll skip the examples, there are many more, and I note that I am not the only one that was subjected to anti-Jewish discrimination. That's in the record. Jay Feingold had a great deal of trouble with Rush because he's Jewish. But this involves an Orthodox Jewish man who's dying. He tells his daughter, go and get me a priest, I want to convert. And she says, what are you doing? Why do you want to convert? You've been Orthodox all your life. He says, just do it. So she does, gets him a priest, and when the priest comes, she says, why are you doing this? Why do you want to convert? And he says, better one of them should die than one of us. That, according to Rush, is not an anti-Semitic remark. And again, Rush had options. The CEO of Rush could have said, yes, these are outrageous. They do not reflect the position of the Rush administration. These were made by not the CEO but others, and they could have defended themselves in that way, and they chose not to. So that's the issue there. Now these remarks began at the time that Rush began his discrimination against Dr. Schott, which occurred shortly after Rush learned that Dr. Schott is Jewish and that she does not work on major Jewish religious holidays. And yet the district court has held that these anti-Jewish remarks and Rush's continuing defense of them are, quote, not evidence of discrimination in this case at all. And I think they're very strong evidence of discrimination. Normally an administration, they're remarkable. Normally a business has more sense to defend things like this. Dr. Schott, can I ask you one other question? Yes, of course. That's why I'm here. In response to the defendant's brief, could you tell us what evidence there is of services you have been providing as a faculty member at Rush in the last five years or so? They've told us you go to campus only to pick up your paycheck, you haven't taught in 20 years, et cetera. Well, it's not true they haven't taught in 20 years. The last time I was allowed to teach, and that's an important distinction, was I believe a couple of years ago, perhaps three years ago. It is not that I have – What were the circumstances? Of what? The teaching a couple of years ago. Oh, that is a longstanding course, a very longstanding course, that I taught for I think about 20 years for the obstetrics and gynecology residents. It's an important course because the residents need that in order to get their board certification. There is a very important statistical component to that board certification exam, and if they fail their statistics, they will fail the whole exam. So it is for credit in that sense that – in fact, it's the most important form of credit. Let me make my question more precise. Have you taught students for credit in, let's say, the last 10 years as a faculty member, tenured member of the faculty at Rush? Okay, the agreement when I transferred from preventive medicine to internal medicine was – Can you answer that question, please? Okay, was that I would not do so, and I adhere to that agreement. What other services do you provide? Okay, whenever Rush – whenever anyone has asked me to teach and I have offered to teach to various departments, and if they've said yes, I do it. When they've asked me to lecture, I do it. I have always provided whatever services anyone wanted me to do. I have offered them repeatedly. That's not really responsive to my question. Well, the question I think is loaded because it presumes that Rush's view is correct, that I have voluntarily declined to provide services, and that is not true. Rush has prevented me in a grossly discriminatory fashion from providing those services. It's sort of like somebody goes to the factory door, and they're fully prepared to do their work, and they slam the door in their face and lock it and say, You can't come in. Okay, thank you. So when I was permitted to do so, I provided a great deal of statistical consultation on the order of 30 to 40 researchers per month, and I have literally stayed up all night when people come to me at the last minute to get their work done. I don't whine about, Just because you didn't prepare, that's not an emergency on my part. I just do whatever I needed to do to get the job done. So I've done all of that. I worked on grants when I was permitted to do so, and if you look at the evidence that is presented, it's very compelling in terms of timing that there was a very sharp drop-off that is very closely timed to events with the EEOC that people would not work with Dr. Shah anymore. So it's not that I'm not willing, and so what I have done instead is something that will, in fact, ultimately be a benefit to Rush, a substantial benefit. It was before, and it will be again, and that is I'm working on a statistics textbook. That brings a great deal of recognition to Rush. I have every reason it will be at least even more successful than the first one, which got an extremely favorable review in the New England Journal of Medicine. That's all they will allow me to do, and it really hurts because I would love to teach, and they will not let me do it. And I love to consult with people, and they will not let me do it. Nobody will call me. Thank you.  Okay, thank you. Thank you. Thank you. Mr. Alper? Ms. Schott, would you mind sitting at the council table, please? Okay. Good morning, Your Honors. May it please the Court, my name is Bruce Alper. I and my co-counsel, Emily Fess, have the honor of representing Rush University Medical Center in this appeal. I want to address a few important points raised in the briefs and in the district court opinion. As to the promotion claim, the district court held correctly that Dr. Schott never attempted to invoke the process that Rush has for faculty promotion. It's a multi-tiered process. All she had to do was contact either her primary chairman, Dr. Levin, or her conjoint appointment, which is in preventive medicine, Dr. Linda Powell, whose name nowhere really appears in the brief, so she can't be one of the bad guys, according to Dr. Schott. Dr. Schott made no attempt to contact them and ask them to consider her for promotion. Dr. Goodman, who was the president of Rush at the time in 2008, and Dr. Deutsch, who was the provo, did not have the authority to promote Dr. Schott. There are five levels of review in a promotion decision for faculty. It would have had to start at the department level, the department chair and department advisory committee, a committee called the COFSAP, Committee on Senior Faculty Appointments or Promotions, the dean, the faculty council, and finally the provo would all have to approve. Dr. Schott says in her brief, why didn't Dr. Deutsch intervene on her behalf? The reason he didn't advocate for her is because he didn't believe she was qualified for promotion. He says that in his affidavit, in his declaration, unequivocally, he has no obligation to advocate for a faculty member who he doesn't believe deserves promotion, and in his affidavit he said he, as the provo and dean, he never, for anyone, attempted to originate the process or initiate it. Dr. Deutsch was not the only person on record who believed Dr. Schott was not qualified for promotion to full professor. Dr. Susan Lorgans is the only faculty level biostatistician at Rush who is a full professor, having attained that rank in 1993. Since 1992, she is only one of two biostatisticians to achieve that rank. She supported Dr. Schott's promotion to tenured position of associate professor in 1993. However, in her declaration, she was unequivocal concerning Dr. Schott's qualifications for promotion to full professor. I commend you to read paragraph 10 of her declaration. She unconditionally states that she does not believe Dr. Schott satisfied any of the requirements for promotion to full professor and would not have supported her. Dr. Schott was unable to obtain the support of any faculty member during her 30 years at Rush to initiate the process for promotion. On her compensation and promotion claims, the district court found there were no similarly situated comparators. The judge was correct. There was no common decision maker on the compensation. Dr. Schott is correct that the dean's office was responsible for paying and deciding her compensation. The dean's office is administered by the vice president of medical affairs, Richard Davis, a declarant in this case, and Dr. Deutsch, who was the dean. There is no evidence that either Dr. Deutsch or Mr. Davis had any input at all into the compensation of any other biostatistician. The compensation process at Rush is like many other institutions of higher education. It starts at the department level and trickles its way up. I gather Dr. Schott is rather alienated from the department. She has, but she really hasn't been at Rush, so no one really thinks about Dr. Schott. So her compensation is just sort of put off in the dean's office, so the department doesn't eat that budget? Correct. It was originally designed to ensure that Dr. Schott's compensation was not affected by people she was accusing of discrimination as a result of the 1994 lawsuit. Ms. Chalmers, could I just ask you, Dr. Schott made a point in her reply brief suggesting that between the first lawsuit and this one, Rush has changed positions regarding the role for her, in essence, either the reasons for or consequences of her inability to obtain outside grant funding for her salary. Could you address the assertion that there's been a contradiction there, sort of flip-flop? I don't believe there has been any contradiction. The record shows that since 2000, year 2000, Dr. Schott has been informed in writing and orally of the expectation that research faculty, she's not a clinician, that research faculty engage in efforts to obtain external funding. Now, she's a support person on a grant, so she has limited ability, but the principal investigators on grants will obtain, will attempt to obtain funding if they believe the support people make a material contribution. That has always been the expectation for research faculty. Dr. Lorgans has testified to that. Dr. Deutsch has testified to that. Dr. Schott testified to it at page 210 and 11 in her deposition, where she admits that there's an expectation for research faculty, and all faculty, but particularly research faculty, to obtain external funding to support their salaries. Dr. Schott's position is that because the, is that she has affirmatively chosen not to obtain external funding, because without any factual support at all, that money was being diverted for criminal purposes, or being diverted criminally, and was not being used for the purpose it was intended to. So, her excuse for not obtaining funding, which she agrees is an expectation, is that the money would be used wrongfully, so she's not going to ask anyone to provide funding for her. That's her position. That's the excuse she uses for having no external funding, 0% since at least 2000. She's the only biostatistician in the last 13 years, 16 years, who fits into that category. And in correspondence in 2008 with Dr. Deutsch, he reiterated that there's an expectation for her to obtain funding. It was a condition for the salary increase that he was proposing. He gave her the salary increase anyhow. She never obtained the funding. Does the record show that she's providing any services to the university? No. The record shows that she's not providing any services, and he hasn't for many years. The only services that she claims she's providing is the update of a textbook she wrote in 1990, which she's been talking about for the last five years. I believe it was 1990. And it was a textbook she wrote at that time, but that's the only services she's provided. She does not come to campus. She has no contact with anyone. She's basically just a number on a payroll. But she's tender. In the few minutes I have remaining, I just want to address the hostile work environment claims. And the reason I want to address it briefly is not because they're significant, but it's a vivid example of what this case is all about. Dr. Schott has made these incredibly prejudicial and offensive allegations against Rush. Rush is basically led by Jewish executives, so you can imagine how we all feel about this. I'm Jewish. My co-counsel is Jewish. And so it's offensive, but the allegations she's made about the way she's been treated at Rush, every time we asked her to provide an example or some witness and she actually identified a witness, we talked to that witness and we obtained declarations from them, from Dr. Burdi, a dermatologist who has no affiliation with Rush, who she says was interfered with. Is that the end of my time, Your Honors? You have one minute. One minute. Thank you. Dr. Burdi, unaffiliated from Rush, testified Rush has never interfered with her. Dr. Pombar, the person whose office she supposedly took it because we were trying to put her in harm's way, testified that that was completely inaccurate. Dr. Usher, a person who she said contacted her after she sent a letter to Dr. Deutsch in retaliation for that letter, Dr. Usher and seven other people wanted to meet with her outside of her home to inconvenience her. Dr. Usher said that is completely untrue. She never had any contact with Dr. Deutsch and doesn't know what Dr. Schott was talking about. So in every example that Dr. Schott testified where she actually identified a person as an occurrence witness to something, there is record evidence showing that there is no basis at all to her allegations. Thank you for your time, Your Honors. We respect the request that the district court's decision be affirmed. Thank you, counsel. Ms. Schott, your time has expired, but I'll give you one minute and rebuttal. Thank you. All I can really say in one minute is that Mr. Alpers, Rush's version of the facts, is extremely different from mine, that I have substantial evidence from my version of the facts, and that it is a jury's decision to decide who is right here. Rush relies solely on declarations from people who work for Rush, who are going to be in a lot of trouble if they don't say what Rush wants them to say. I have got e-mails. I have got all kinds of documents and rules for governance. All of that support what I am saying. Dr. Deutsch is the salary decision maker for every single Rush Medical College faculty biostatistician. Dr. Deutsch is the ultimate decision maker for every single Rush Medical faculty biostatistician for promotion, and for all Rush Medical faculty. That is right in the rules for governance, and Rush can't change that. At the last minute, they have claimed that Dr. Davis is somehow Dr. Schott's salary decision maker. If that were true, that would be grossly discriminatory, because why should Dr. Schott be singled out and have somebody who only has a master's degree and doesn't know beans about statistics decide Dr. Schott's salary? It doesn't make any sense. So these are all hotly contested issues. Most of what Mr. Alper has said is completely wrong. And I would emphasize again, I cannot force people to let me teach. I cannot force people to consult with me. But when people go, when I am working at home and not going to Rush and still seeing 30 to 40 researchers a day by phone and e-mail, which is the only way anybody works anymore, doing research, and that drops to zero, something happens. And I didn't do it. The case will be taken under advisement.